Argued August 22, affirmed October 20, 1975

ROBINSON ET AL, *Appellants, v.* FELTS
(No. 411-675), *Respondent.*

541 P2d 506

*John D. Ryan,* Portland, argued the cause and filed the brief for appellant.

*Gary E. Rhoades,* Portland, argued the cause for respondent. With him on the brief were Bauer, Murphy, Bayless & Fundingsland, Portland.

Before Schwab, Chief Judge, and Foley and Lee, Judges.

LEE, J.

Claimants are the minor child and spouse of the deceased employe whose claims were denied by the hearing officer, the Workmen's Compensation Board, and the circuit court.

Ingrid Vivian Robinson was a 29-year-old married woman, and Robert (Bobby) Symes was a 57-year-old single man. Mrs. Freda Felts, a non-complying employer, owned the cafe in a Portland suburb where Robinson worked as a waitress at the time of her death.

Symes and Robinson first became acquainted about 1970. They then lived in separate apartments in the same apartment house. At that time, Robinson (then Foss) was living with "Skip" Robinson whom she married on July 9, 1971. The Robinsons resided elsewhere after their marriage.

A Miss Anderegg was a former cafe employe of Felts and had known Symes for four years. She lived at her father's farm where Symes resided on May 14, 1973. She testified that in 1972 and until approximately May of 1973, Robinson and Symes were "very affectionate" toward each other and she had observed "kissing and hugging." Anderegg had also observed the words "I love you" written on a mirror in Symes's bathroom. She was told by Symes that Robinson had written it; the writing was in pink lipstick.

Evelyn Remsen owned a shop near the cafe. She testified that about a month before Robinson's death, she saw Robinson and Symes "kissing."

Symes had been a friend of Felts for eight

years. Symes occasionally did chores—such as washing the dishes and emptying the trash at the cafe in return for meals. This was not a scheduled arrangement. Symes was also a frequent paying customer of the cafe.

Robinson had worked for Felts as a waitress from May 1971 to May 1972; September 1972 to February 1973; and finally, from May 7, 1973 until her death May 14, 1973.

When Felts was asked, "How would you describe the relationship between Mr. Symes and Mrs. Robinson from your own firsthand observations?", she replied, "Well, she couldn't keep her hands off of him." She said that Robinson and Symes were "more than friends." She observed embraces and "passionate" kisses between the two. Felts observed displays of affection between Symes and Robinson "many times." She testified that "Every time Vivian [Robinson] would get off work, he could hardly wait to get his coat on and open the door and go out with her every time, every day."

Another witness was Connie Moyer. Mrs. Moyer worked in the "Ship" (formerly Ship Ahoy) tavern nearby. She had known Symes since her childhood and had known Robinson since she worked at the cafe. Mrs. Moyer was also a customer of the cafe where she saw Robinson and Symes together, kissing and embracing "several times" in the six months immediately preceding the killing. Mrs. Moyer also saw Robinson and Symes at the tavern where, again, they were affectionate to one another.

In 1973, Symes's landlady saw Robinson and Symes embracing on the street adjacent to her apartment building.

Symes's daughter, Mrs. McLean, testified that

Symes had a picture of Robinson in his apartment and seemed proud of it. Symes introduced Robinson to his daughter, Mrs. McLean, "with a great deal of pride in the way he spoke of her and in the way he talked to her." She said that "either in person or on the phone he was always talking about Vivian." Her observations covered the period of the summer of 1972 to a month or so before Robinson's death in May 1973.

The relationship between Robinson and Symes became strained in April and May 1973.

Miss Anderegg testified that in April 1973, Symes was upset because Robinson was not encouraging him, was ignoring him and was apparently breaking off their relationship.

Mrs. Moyer was asked whether she observed any changes in the relationship between Symes and Robinson shortly prior to May 14, 1973. She replied, "I think Vivian was just trying to maybe ignore him at the last or not be quite as friendly with him."

When his daughter, Mrs. McLean, was asked whether Symes seemed any different in April 1973, she replied, "* * * I would call him and he would be waiting for Vivian to call or to show up, and it would upset him because more and more she would say that she would come by to see him or that she would phone him and then wouldn't. And that didn't set very well with my father." She also noted that her father had begun drinking more. She said her father did not forgive easily. She said her father "never discussed things with people. He would sit on them and brood over them, and eventually they could come out."

Miss Anderegg said that in early May 1973 Symes told her that he was "still having problems

\* \* \* getting a hold of her [Robinson] and talking to her" and that Robinson "was not available to him."

Cafe-owner Felts stated that when Robinson came back to work May 7, 1973, Felts asked her "not to have Bobby [Symes] come around because my customers were complaining about it." Felts testified that she did not, however, tell Symes himself to stay away from the cafe. Felts did not remember ever seeing Symes in the cafe from May 7 to May 14, 1973.

A few days before Robinson went back to work at the cafe on May 7, 1973, Miss Anderegg had a conversation with Symes during which, she testified, the following exchange took place: "I asked him if Vivian [Robinson] was—I had heard that she was going back to work. And I asked him if she was. And he said, yes, that she had talked to Art [Mr. Felts] and Freda [Mrs. Felts] and she was going back to work. But he said it was over his dead body that she would go back to work." The witness continued: "\* \* \* When he said it, I said, 'Oh, Bobby.' He said, 'I mean it.' But still I thought it was just a figure of speech." Anderegg never communicated the threat to Robinson.

Charles Newton, a habitue of the cafe, had known Symes casually for several years and had been well-acquainted with him approximately two years. Newton testified that he met Symes two or three days before Robinson went back to work and the following conversation occurred:

"\* \* \* He said, 'Do you know that Vivian [Robinson] is going back to work under Freda [Felts]?' I said, 'What about it?' He said, 'If she does, it will be over my dead body.'"

Finally, Mrs. Moyer recalls a tragically prophetic conversation with Symes in the "Ship" wherein Symes said that "[E]veryone had someone to go home to. He didn't. Vivian [Robinson] had her husband. Fre-

.da had Art, you know. And he said if he couldn't have Vivian, nobody could."

Bill Stender had known Symes for over six years. Shortly prior to May 14, 1973, Stender had heard Symes mention that he had a gun that he kept at Mr. Anderegg's place for protection. On May 14, 1973, while Symes was living at the Anderegg residence and Mr. Anderegg was away on vacation, Stender assisted Symes by driving a pickup to make a delivery to Mr. Anderegg's farm which was at a different location than the Anderegg residence. The two men then drove to the Anderegg residence to drop off the pickup and pick up Stender's car. Stender remembers this as being 4:15 p.m. As Stender started his car, Symes said, "Just a minute, I want to go back. I've got to get something from the house." Symes went into the house and returned with a paper bag. Symes did not tell Stender what was in the bag. Symes and Stender proceeded to the "Ship" and parked nearby. Symes walked toward the cafe. Stender recalls the time as about 4:30 p.m.

The next witness to see Symes was Evelyn Remsen. Her shop is located one block from the cafe across the street. At about 5 p.m. as she was closing for the day, she saw Symes and Robinson talking on the street corner, about 25 feet from her shop. Robinson and Symes were facing each other. Robinson's voice was raised. Remsen could not hear what was being said. Remsen observed them crossing the street to the side where the cafe was located. Symes was following Robinson, 10 or 12 feet behind. Remsen was asked: "How would you describe the pace of her walking?" She answered: "Well, it wasn't leisurely. She was going at a pretty good pace, fast enough that he was walking behind her but they were not walking together."

In the late afternoon of May 14, 1973 Felts was

working with Robinson in the cafe. At about 5:20 p.m. Felts departed the cafe to see her husband. Felts returned about twenty minutes later and discovered the bodies of Robinson and Symes. Felts called her husband who arrived about five minutes later. He called the ambulance; they called the police.

Both Symes and Robinson died of gunshot wounds. Counsel for both claimants and employer agreed that Symes shot Robinson. Neither party contests the finding of the referee, the Board, or Detective Wilson of the Portland Police Department who investigated the deaths, that Symes, after killing Robinson, killed himself. The gun was found next to Robinson's body. A paper sack was found in Symes's hand. Detective Wilson concluded that robbery was not a motive since money was still in the cafe till and $85.15 was on the body of Robinson.

We think the evidence is strong that Symes had dual motives for killing Robinson: (1) he was despondent about being ignored by her and (2) she returned to work against his will. We find that both motives were causes of her death. This conclusion seems inescapable even though the causal connection between the return to work and the death was created by Symes's bizarre reasoning and wrongful act.

Our decision must be based on the application of ORS 656.002(7)(a), which defines "compensable injury":

"A 'compensable injury' is an accidental injury, or accidental injury to prosthetic appliances, *arising out of* and in the course of employment requiring medical services or resulting in disability or death; an injury is accidental if the result is an accident, whether or not due to accidental means." (Emphasis supplied.)

■ The *first* question is whether Robinson's death

was "accidental." In *Olson v. State Ind. Acc. Com.*, 222 Or 407, 411, 352 P2d 1096 (1960), our Supreme Court said:

> "An accident may, in general, be defined as 'an unlooked-for mishap or an untoward event which is not expected or designed.' *Fenton v. J. Thorley & Co., Ltd.*, (1903) AC 443, 448. See also *Clover, Clayton & Co., Limited v. Hughes,* (1910) AC 242, 3 BWCC 775."

We find that Robinson's death was an "accident" within the purview of the Workmen's Compensation Act.

■ The *second* question is whether the death arose "in the course of" Robinson's employment. We find that it did. *Stark v. State Industrial Acc. Com.*, 103 Or 80, 89, 90, 204 P 151 (1922).

The *third* and pivotal consideration is whether Robinson's death arose out of her employment.

In *Blair v. State Ind. Acc. Com.*, 133 Or 450, 455, 288 P 204 (1930), the court said:

> "* * * For a personal injury to *arise out of* and in the course of the employment, there must be some connection between the injury and the employment other than the mere fact that the employment brought the injured party to the place of injury. There must be a causal connection between the employment and the injury which had its *origin in a risk connected with the employment,* and flowed from that source as a *rational* and *natural consequence* * * *." (Emphasis supplied.)

We find that Robinson's death was not "a rational and natural consequence" of her employment. The "risk" was not "connected with the employment" but instead arose out of a personal relationship with Symes. To hold otherwise in a case like this would be to ignore the "arising out of" requirement of the statute.

We next deal with certain other theories urged by claimants.

*First,* claimants suggest that a sufficient work connection is established by Felts's request to Robinson to not have Symes come around when Robinson was on duty. We reject this theory. If Robinson did convey the message to Symes then his anger would have most probably been directed at Felts.

*Second,* claimants attempt to bring Symes into that category of cases dealing with assaults by fellow employes, characterizing Symes as a "near employe" of the cafe. The facts do not support such a characterization. Symes was not an employe in the usual sense. He did not perform chores according to a schedule—rather, he worked at times of his own need or choosing. There was no fixed compensation for his duties. He was never paid in money. Finally, there was nothing resembling employe status at the time of the killing.

*Third,* claimants contend that "* * * [T]he important factor is that the workman be in the course of his employment at a place where he is reasonably required to be at a particular place and a particular time and that he there meets with an accident * * *," citing *Louie v. Bamboo Gardens,* 67 Idaho 469, 185 P2d 712, 716 (1947). In *Louie* a restaurant worker was injured by an insane man who fired random shots, one of which struck the claimant. In sustaining the award the court noted that there was no intent to injure the claimant specifically. Symes, by contrast, was not shooting at random—his target was Robinson.

*Fourth,* claimants rely on the maxim "inclusio unius est exclusio alterius" for the contention that "only the particular exceptions in the act constitute a bar to recovery for an injury sustained by the workman in the course of his employment," citing *Stark v.*

*State Industrial Acc. Com.,* 103 Or 80, 90, 204 P 151 (1922), which says:

> "* * * Applying the maxim, 'inclusio unius est exclusio alterius,' to this proviso or exception, it would seem that an employee, while subject to the act and in the service of an employer who is also subject to the act, if he shall sustain a personal injury by accident *arising out of* and in the course of his employment caused by violent or external means, will be entitled to compensation * * *." (Emphasis supplied.)

*Stark,* however, is based on the assumption that the injury is one "arising out of" the employment which is the very question here in issue.

Affirmed.